| | | |
|---|---|---|
| LEGO SYSTEM A/S, | : | |
|     Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:15-cv-000823 (VLB) |
|     v. | : | |
| | : | |
| RUBICON COMMUNICATIONS, LP | : | September 27, 2017 |
| d/b/a SMALLWORKS; | : | |
| SMALLWORKS, LLC; RUBICON | : | |
| COMMUNICATIONS, LLC; JAMIE L. | : | |
| THOMPSON; JAMES W. THOMPSON | : | |
|     Defendants. | : | |

## ORDER ON CLAIM CONSTRUCTION OF DISPUTED TERMS

### I.   Introduction

Before the Court is a patent infringement case filed by LEGO System A/S ("LEGO" or "Plaintiff") against Rubicon Communications, LP ("Rubicon") doing business as SmallWorks ("SmallWorks"), Jamie Thompson, and James Thompson[1] (collectively, "Defendants") for the infringement of the '191 Patent Family, which includes U.S. Patent No. 7,731,191 ("the '191 Patent") and its continuation patents: U.S. Patent No. 8,091,891 ("the '892 Patent"), U.S. Patent No. 8,628,085 ("the '085 Patent"), and U.S. Patent No. 8,894,066 ("the '066 Patent"). Plaintiff seeks monetary damages, an injunction against future infringement of the asserted patents, and attorneys' fees. [Dkt. 71 (Am. Compl.) at 10]. Defendants filed counterclaims seeking declaratory judgment of invalidity and non-

---

[1] Defendants Jamie and James Thompson were added to the case on June 14, 2017, by way of Plaintiff filing the Amended Complaint after receiving leave to amend the original complaint. *See* [Dkt. 71].

infringement of each patent.  [Dkt. 72 (Def.'s Ans. Am. Compl.)].  The Court held a *Markman* hearing on March 6, 2017, and now addresses claim construction terms.

## II.  Background

### A.  *The Parties*

Defendants offer SmallWorks BrickCase products that include "LEGO® brick-compatible cases for iPhone, iPod, iPad, and similar devices."  [Dkt. 71 ¶ 13]. Defendants operate a website where it sells, in relevant part, its BrickCase products (it also sells BrickCase products on other social media).  *Id.* ¶ 14.  These BrickCase products are alleged to be available worldwide in retail locations and online outlets.  *Id.* ¶ 18.

LEGO is a company incorporated under the laws of Denmark where it also has its principal place of business.  *Id.* ¶ 1.  LEGO is one of the world's largest toy manufacturers, and it is best known for its traditional LEGO® brick.  [Dkt. 36 (Pl.'s *Markman* Br.) at 2].  The company is the owner of the four patents at issue in this case.  LEGO alleges that the sale of Defendant's products infringes upon the '191 Patent Family.

### B.  *The Patents*

The '191 Patent was filed on February 9, 2007, and "claims benefit of" its provisional patent filed February 10, 2006.  [*See* Dkt. 71-4 ('066 Patent), at 24].  The three continuation patents—'892 Patent, '085 Patent, '066 Patent—all claim to

benefit from the provisional patent.[2]   LEGO asserts infringement of all claims attributable to these patents.

The '191 Patent is the "original" as it is "the first application in a chain of continuing applications," but it is also known as the "parent," a term "often used to refer to the immediately preceding application upon which a continuing application claims priority. . . ."  *Transco Prods. Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 555-56 (Fed. Cir. 1994).  A "continuing" patent application is "one filed during the pendency of another application which contains at least part of the disclosure of the other application and names at least one inventor in common with that application."   *Id.* at 555.   There are three types of "continuing" patent applications: continuation, divisional, or continuation-in-part ("CIP").[3]   *See id.* (citing *The Manual of Patent Examining Procedure* ("MPEP"), § 201.11 (1988).  In this case all continuing applications are classified as "continuation" applications, *see* [Dkt. 71-2 at 2, Dkt. 71-3 at 2, Dkt. 71-4 at 2], which means they "claim[ ] the same invention claimed in an earlier application, although there may be some variation in the scope of the subject matter claimed."  *Transco Prods.*, 38 F. 3d at 555 (citing *MPEP* § 201.07).  Notably, a continuing application "is entitled to the

---

[2] These continuation patents were filed on the following dates: (1) '892 Patent filed on June 7, 2010; (2) '085 Patent filed on January 10, 2012; and (3) '066 Patent filed on January 14, 2014.  *See id*; [Dkt. 71 ¶¶ 8-11].

[3] A divisional patent application "is carved out of an earlier application which disclosed and claimed more than one independent invention, the result being that the divisional application claims only one or more, but not all, of the independent inventions of the earlier application."  *Id.* (citing *MPEP* § 201.06).  A "CIP" patent application "is a continuing application containing a portion or all of the disclosure of an earlier application together with added matter not present in that earlier application."  *Id.* (citing *MPEP* § 201.08).

benefit of the filing date of an earlier application only as to common subject matter." *Id.* at 556.

Here, all four patents share the same specification, which includes the written description and preferred embodiments.[4]  Specifically, the '191 Patent Family relates to patents for "a manual controller for manipulating images or symbols on a visual display and, in particular, to a controller that can be constructed with user-arranged matable building elements to exhibit a customized shape and style depending on user game-inspired, ergonomic, or appearance preferences."  [Dkt. 71-1 ('191 Patent) at 24 (1:20-25)].  In essence, the patents enable LEGO pieces to be put on manual controllers so that users can build on the controllers for their desired uses.  "Manual controllers for manipulating images or symbols on a visual display of a computer device include, for example, joysticks, game pads, steering wheels, guns, mice, remote devices for television, stored multi-media display and recording machines, cellular telephones, portable video game systems, and portable multi-media devices." *Id.* (1:29-34).  While the specifications are identical, the variation lies with the claims themselves.  Below, the Court will address these variations as it resolves the claim construction terms.

III.  <u>Legal Standard</u>

Resolution of a patent infringement case entails a two-step process, the first of which is claim construction, and the second of which is a comparison of the patented device or process to the accused device or process applying the terms

---

[4] Accordingly, the Court will cite only '191 Patent when referring to shared specification information.

as construed.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir.  1998),

*abrogated on other grounds*; *Phil-Insul Corp. v. Airlite Plastics Co.*, No. 2016-1982,

2017 WL 1374696, at *10 (Fed. Cir. Apr. 17, 2017) (same).  Only those terms that are

in controversy need to be construed, and the construction only needs to be to the

extent necessary to resolve the controversy.  *Vivid Techs., Inc. v. Am. Science &

Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999).  Claim construction, furthermore, is

a question of law, and the Court has the exclusive power to construe "the meaning

of the language used in the patent claim."  *Markman v. Westview Instruments, Inc.*,

52 F.3d 967, 977-79 (Fed. Cir.  1995), *aff'd*, 517 U.S. 370 (1996); *3M Innovative Props.

Co. v. Tredegar Corp.*, 725 F.3d 1315, 1321 (Fed. Cir. 2013).  Accordingly, "[c]laim

construction is a legal statement of the scope of the patent right; it does not turn

on witness credibility, but on the content of the patent documents."  *Lighting

Ballast Control LLC v.  Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, at 1284 (Fed. Cir.

2014) (en banc), *vacated on other grounds*; *In re Cuozzo Speed Techs, LLC*, 793

F.3d 1268, 1286 (Fed. Cir. 2015) (citing *Lighting Ballast Control LLC* for the principle

that "[l]egal doctrine in patent law starts with the construction of the patent claims,

for the claims measure the legal rights provided by the patent.").

      The Court is to begin the claim construction analysis with intrinsic evidence.

*Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1299-300 (Fed. Cir.

2004).  "Intrinsic evidence includes the claim language, the written description that

precedes the claims in the patent specification, and, if in evidence, the prosecution

history."  *Chrisha Creations, Ltd. v. Dolgencorp, Inc.*, 817 F. Supp. 2d 363, 366

(S.D.N.Y. 2011) (citing *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1323 (Fed.

Cir. 2001)). Procedurally, when constructing patent claims, "claim terms are given their ordinary and customary meaning, as they would be understood by one of ordinary skill in the art in question at the time of the invention." *3M Innovative Props. Co.*, 725 F.3d at 1321; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). A person of ordinary skill in the art "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Courts must first rely only on intrinsic evidence to resolve any claim term ambiguity, and it is impermissible to use extrinsic evidence to "contradict the established meaning of the claim language." *See DeMarini Sports*, 239 F.3d at 1323.

The Patent Act requires the specification to "contain a written description of the invention, and of the manner and process of making it and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is more nearly connected, to make and use the same." 35 U.S.C. § 112. A written description generally contains "an abstract of the invention, a description of the invention's background, a summary of the invention, patent drawings, and a detailed description that discusses preferred embodiments of the invention." *Chrisha Creations, Ltd.*, 817 F. Supp. 2d at 367; *see Dymo Costar Corp. v. Seiko Instruments USA, Inc.*, No. 3-00-cv-4 JHC, 2000 WL 502616, at *14 (D. Conn. Mar. 20, 2000) (listing "all parts of the specification" as "the sections detailing the background, summary, and preferred embodiment of the invention") (citing *Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1356-57 (Fed. Cir. 1999));

*Lamoureux v. AnazaoHealth Corp.*, 669 F. Supp. 2d 227, 255 (D. Conn. 2009) (referring to background of the invention of the specification to determine appropriate claim construction).

"Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1314 (Fed. Cir. 2010) (quoting *Phillips*, 415 F.3d at 1314-15) (although claim construction is dependent on the language of the claims themselves, it requires reading that language "in view of the specification, of which they are a part"). "Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification." *3M Innovative Props. Co.*, 725 F.3d at 1321; *see also Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1365–67 (Fed. Cir. 2012) ("The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history."). The Court may refer to the "descriptive part of the specification" to determine the scope and meaning where the claims are based on the description. *Phillips*, 415 F.3d at 1315. The specification may be used to define terms even in the absence of an "explicit definitional format," as it may "define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Trustees of Columbia Univ. in City of New York*, 811 F.3d 1359, 1364 (Fed. Cir. 2016).

Even though the specification informs the Court as to the use of the terms in the claims, "limitations discussed in the specification may not be read into the

claims." *3M Innovative Props. Co.*, 725 F.3d at 1321 (citing *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010)). References to a preferred embodiment in a specification is not a claim limitation. *Janssen Pharmaceutica N.V. v. Eon Labs Mfg., Inc.*, No. CV 01-2322 (NG) (MDG), 2003 WL 25819555, at *9 (E.D.N.Y. Nov. 26, 2003) (citing *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc)). That being said, "the patentee's choice of preferred embodiments can shed light on the intended scope of the claims." *Astrazaneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mut. Pharm. Co., Inc.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004).

Also, the preamble language is not to be interpreted to limit the scope of the claim when it "merely states the purpose or intended use of an invention." *United Techs. Corp. v. PerkinElmer, Inc.*, 537 F. Supp. 2d 392, 397 (D. Conn. 2008) (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006)). The preamble may limit the claim, however, when the body of the claim "rel[ies] upon and derive[s] antecedent basis from the preamble" or if the drafter "chooses to use *both* the preamble and the body to define the subject matter of the claimed invention." *United Techs. Corp*, 537 F. Supp. 2d at 397. Determining whether the preamble is limiting must be based on "the facts of each case in light of the *claim as a whole* and the *invention described in the patent.*" *Id.* (quoting *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003)).

Other claims from the patent may also be helpful to determine the meaning of a claim term, because in general claim terms are consistently used throughout the patent. *Phillips*, 415 F.3d at 1314. An example of this principle is where a dependent claim adds a limitation, because such a limitation creates the

presumption that the limitation does not exist in the independent claim. *Id.* at 1314-15.

Where, as here, multiple patents are at issue, claims must be interpreted "consistently across all asserted patents" when they "derive from the same parent application and share many common terms." *Trustees of Columbia Univ.*, 811 F.3d at 1369 (quoting *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005), *abrogated on other grounds recognized in Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1047 (Fed. Cir. 2016); *Microsoft Corp. v. Multi-Tech. Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004) (construing the specification shared by all three patents the same way); *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019 (Fed. Cir. 1997), *modified on reh'g*, 131 F.3d 1009, 1010 (Fed. Cir. 1997) ("Although these claims have since issued in separate patents, it would be improper to construe this term differently in one patent than another, given their common ancestry."). Notably, "[i]t is recognized that an applicant can broaden as well as restrict his claims during the procedures of patent examinations, and that continuing applications may present broader claims than were allowed in the parent." *Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1317 (Fed. Cir. 2007) (citing *Symbol Tech., Inc. v. Lemelson Med., Educ. & Research Found.*, 422 F.3d 1378, 1385 (Fed. Cir. 2005) ("Commonly, and justifiably, one might refile an application to add subject matter in order to attempt to support broader claims as the development of an invention progresses, although entitlement to an earlier filing date for any claimed subject matter may of course be necessary to avoid a statutory bar created by intervening events outlined in 35 U.S.C. §§ 102 and 103.").

The prosecution history is another form of intrinsic evidence relevant to claim construction, particularly where a court must consider multiple patents in one family. Similar to the specification, prosecution history reflects a patentee's "attempt[ ] to explain and obtain the patent" and evidences how the PTO and inventor understood the patent. *Phillips*, 415 F.3d at 1317. "A statement made during prosecution of related patents may be properly considered in construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent at issue." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015). It is during prosecution history where an applicant may "define (lexicography), explain, or disavow claim scope during prosecution." *Id.* The prosecution history is particularly important because it may demonstrate "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. Limitation statements made during prosecution are relevant to both later and earlier issued patents. *See Microsoft Corp.*, 357 F.3d at 1350 ("[W]e conclude that Multi–Tech's statements made during the prosecution of the #627 patent with regard to the scope of its inventions as disclosed in the common specification are relevant not only to the #627 and the [later issued] #532 patents, but also to the earlier issued #649 patent."); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation."). Once such limitations are in place, "an

applicant cannot recapture claim scope that was surrendered or disclaimed." *Hakim*, 479 F.3d at 1317.

Where the intrinsic evidence alone cannot resolve claim term ambiguity, the Court may also rely on extrinsic evidence, "which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (citing *Markman*, 52 F.3d at 980) (internal quotation marks omitted). Extrinsic evidence, however, is less significant than intrinsic evidence when "determining the legally operative meaning of claim language. *Id.* (internal quotation marks omitted). This is for five reasons: (1) extrinsic evidence is not part of the patent and is not created at the time of the patent prosecution to explain scope and meaning; (2) extrinsic evidence may not be created by skilled artisans and therefore may not reflect the artisan's understanding; (3) expert reports and evidence is made for the purpose of litigation and may be biased; (4) the large volume of extrinsic evidence will lead parties to choose that which is most favorable; and (5) undue reliance on extrinsic evidence risks changing the meaning of claims. *Id.* at 1318-19.

Dictionaries, general and technical alike, may be helpful because they "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly

understood words." *Phillips*, 415 F.3d at 1314. Where this is the case, "general purpose dictionaries may be helpful." *Id.*

IV.   <u>Analysis</u>

In this case, Plaintiff is asserting against the Defendant the following claims: claims 1-6 and 8 of the '191 Patent, claims 1-6 of the '892 Patent, claims 1-4 of the '085 Patent, and claims 1-8 of the '066 Patent. [*See* Dkt. 36, at 3-5]. The parties dispute the meaning of several specific terms found within the patent claims and agree upon a few terms. The Court first addresses the disputed terms.

A.   <u>*Disputed Terms*</u>

1.   *"Controller" Terms*

The parties dispute the construction of "configurable manual controller," "manual controller," and "controller." "Configurable manual controller" appears only in the '191 Patent (claims 1-6 and 8); "manual controller" appears in the '892 Patent and '085 Patent (claims 1, 4, and 6; and claims 1, 2, and 4; respectively); and "controller" appears only in the '066 Patent (claims 1, 2, and 4). [Dkt. 71-1, at 26-27; Dkt. 71-2 ('892 Patent), at 26-27; Dkt. 71-3 ('085 Patent), at 26-27; Dkt. 71-4 ('066 Patent), at 26-27].

The background information for the '191, '892, '085, and '066 Patents all state, "Manual controllers for manipulating images or symbols on a visual display of a computer device include, for example, joysticks, game pads, steering wheels, guns, mice, remote devices for television, stored multi-media display and

recording machines, cellular telephones, portable video game systems, and portable multi-media devices." [Dkt. 71-1, at 24 (1:34-39)].

LEGO advocates for a single, broad definition for the "controller terms" where all "controllers" are defined as a "a handheld device used to manipulate images or symbols on a visual display of a computing device, wherein the handheld device and computing device may or may not be integrated (in a single device)." [Dkt. 34-1 (Joint Disputed Claim Terms Chart), at 2]. LEGO proposes the term "configurable" be construed according to ordinary meaning and does not require a separate definition. *See id.* at 9. In support of its argument, LEGO cites the background information of the specification, which broadly refers to a "manual controller" in terms of the types, appearances, structures, and methods for operation. [*See, e.g.,* Dkt. 71-1, at 24 (1:48-51)].

Defendants argue that "controller terms" should have two separate definitions. [Dkt. 35 (Def.'s *Markman* Br.), at 8]. Both "manual controller" and "controller" should be defined as "an electronic device used to manually manipulate images or symbols on a visual display of a computing device." [Dkt. 34-1, at 9]. In contrast, "configurable manual controller" should be defined differently to include the definition of "manual controller" with the added phrase: "in which the electronic device is adapted by the user attaching building elements onto the electronic device itself." *Id.* Defendants have two principle arguments for disputing LEGO's proposed claim terms.

First, Defendants claim that the '191 Patent's language "configurable manual controller" contemplates only a controller where the patterned surface portion is

part of the actual controller (i.e. there is no separate casing).   In support, Defendants argue that the preferred embodiments in Figures 1 and 2 represent the "manual controller" and "controller" referenced in the '892 Patent, '085 Patent, and '066 Patent, on account of the reference to a "casing" in these three patents' claims.  [Dkt. 35, at 9; *see, e.g.* Dkt. 71-2, at 26 ("a configurable casing"); Dkt. 71-3, at 26 (same); Dkt. 71-4, at 26 ("providing a main casing")].   As a comparison, Figures 3 through 9 relate only to a "configurable manual controller" because the building elements are placed directly on the controller and there is no "casing" present.  [Dkt. 35, at 8].  Figures 1 and 4 are herein provided as examples for the reader's comparison:



This  argument  lacks  merit  because  it  would  lead  to  an  inconsistent interpretation  of  the  "controller"  claim  terms  as  they  are  referenced  in  the specification.   Figure 1 is expressly described as "an exploded view of a first preferred embodiment of a <u>configurable manual controller</u>."  [Dkt. 71-1, at 24-25 (2:56-57) (emphasis added)].  It is therefore inconsistent for Figure 1 to represent a "manual  controller"  or  "controller,"  unless  "configurable  manual  controller" possesses a compatible definition.   Furthermore, the abstract in '191 expressly

14

refs to both Figure 1 and Figure 4 as representing a "configurable manual controller." *See id.* at 24 (2:67, 4:65-5:9) (listing <u>10</u> and <u>140</u>, shown above, as examples of "configurable manual controller"). There is no indication in the specification that "configurable manual controller" should have a substantively different definition from "controller" or "manual controller." Rather, the words "configurable," "configured," and "configurations" are used throughout the specification in connection with various terms apart from "manual controller."[5] Thus, the Court finds that "controller" and "manual controller" shall have the same claim construction and be applied uniformly throughout each patent. "Configurable" shall be construed according to its plain meaning.

Second, Defendants posit that LEGO's phrase, "wherein the handheld device and computing device may or may not be integrated (in a single device)," is inappropriate as the claims do not contain this language and the specification suggests the opposite conclusion is more accurate. Defendants cite the detailed description of preferred embodiments, which indicates Figure 1 "is used with a computing device (not shown) for manipulating images or symbols on a display (not shown)" and "[a]lthough it does not show a cable, this embodiment can be connected to a computing device through a cable or a wireless communication link." *Id.* at 24 (2:57-61).

---

[5] For example, "configured" is connected to "patterned surface portion," *Id.* at 24 (1:59-60), 25 (4:30), 26 (6:51-54). "Configurable" is connected to "building elements," *id.* (6:55-61), "interior region," *id.* (6:45-49). "Configuration" is connected to "control actuator" and "hand grip." *Id.* at 25 (3:17-21).

It is well-settled that the specification, which includes preferred embodiments, may not be used to limit the claim. *See 3M Innovative Props. Co.*, 725 F.3d at 1321 ("While we construe the claims in light of the specification, limitations discussed in the specification may not be read into the claims."); *Janssen Pharmaceutica N.V.*, 2003 WL 25819555, at *9 (noting a reference to a preferred embodiment may not limit claims). That being said, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Reinshaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). A proper claim construction should reflect a "full understanding of what the inventors actually invented and intended to envelop with the claim." *Id.* It is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Phillips*, 415 F.3d at 1317.

The Court finds LEGO's proposed claim construction, advocating that the controller and computing functions may be separate devices or integrated in a single device, is consistent with the background information in all the patents. Defendants are correct in stating that preferred embodiments shed light on a claim, and all of the preferred embodiments depict control devices separate from the computing device, but preferred embodiments do not limit claims generally. Moreover, the examples of a "manual controller[ ] for manipulating images or symbols on a visual display of a computing device" in the background information includes "cellular telephones, portable video game systems, and portable multi-media devices" all of which are electronic devices in which the controls and the

computing functions are integrated in a single device.  [Dkt. 71-1, at 24 (1:34-39)].

Adopting Defendants' proposed definition would be inconsistent with the

background information and the requirement that patents be read as a whole. *3M*

*Innovative Props. Co.*, 725 F.3d at 1321.

As aforementioned, where patents "derive from the same parent application and

share many common terms, [the Court] must interpret the claims consistently

across all asserted patents."  *NTP, Inc.*, 418 F.3d at 1293; *SightSound Techs., LLC.*

*v. Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015) (same).  Claim 7 of the '066 Patent

states, "[t]he method of claim 1, in which the controller comprises a cellular

telephone and a control section, the cellular telephone being operationally

responsive to user-entered commands that are delivered to the control section."

[Dkt. 71-4, at 27 (8:13-16)].   Such language does not mean that the controller and

visual display are or are not integrated.  This claim indicates the cellular telephone

can operate both as a functioning call device and a controller capable of

"manipulating images or symbols on a visual display of a computer device."  [Dkt.

71-4, at 24 (1:38)].  The Court's construction therefore does not conflict with this

claim.

Accordingly, the Court adopts LEGO's proposed claim construction in part.

"Controller" and "manual controller" are to be construed as "a handheld device

used to manipulate images or symbols on a visual display of a computing device,

which may or may not be integrated with a computing device."  [Dkt. 34-1, at 2].

"Configurable manual controller" shall not be given a separate definition, but

rather "configurable" shall take on its ordinary meaning.  *See id.* at 9.

### 2. *"Exoskeleton"*

The parties dispute whether the exoskeleton of a manual controller should be defined by itself or within the claim phrase in which it is used. The term "exoskeleton" appears only in claims 1, 6, and 8 of the '191 Patent although it is referenced throughout the specification.

LEGO provides a broad claim construction for exoskeleton: "the entire external portions of or surrounding a manual controller." [Dkt. 34-1, at 3]. LEGO cites the detailed description of preferred embodiment for Figure 1, which states, "Skilled persons will appreciate that exoskeleton 12 can be alternatively made as a unitary structure having a surface on which patterned surface portion 20 is formed." *See* [Dkt. 71-1, at 24-25 (2:62-3:8)]. LEGO also draws upon the Dictionary definition of "exoskeleton," which is "an artificial external supporting structure." [Dkt. 36, at 22]. The Court interprets LEGO's proposal to mean the exoskeleton comprises the external portions of the manual controller regardless of whether the controller is fit into a casing, and that the exoskeleton may be smooth or have patterned building elements.

Defendants posit that "exoskeleton" should be construed as part of a claim phrase that includes other terms so that the jury may fully understand the contextual meaning, the claim phrase: "an <u>exoskeleton</u> having an interior region and a patterned surface portion." [Dkt. 34-1, at 9]. With this claim phrase in mind, Defendants propose the claim phrase to be construed as follows:

> An exterior housing that is part of and for the configurable manual controller in which an interior portion of the housing is for the

electronic components of the configurable manual controller, and the exterior portion is a patterned surface portion <u>without a casing or case</u>.

*Id.* at 3 (emphasis added).  Defendants contend that LEGO's claim term proposal reads out limitations as it fails to define "interior region" and "patterned surface portion," which are part and parcel of claim 1 of the '191 Patent.  [*See* Dkt. 71-1, at 26 (6:49-51) (containing the language: "an exoskeleton having an interior region and a patterned surface portion")].  In support, Defendants argue such an interpretation is consistent with the detailed description of preferred embodiments for Figure 4, which describes the "exoskeleton" of the manual controller as "a main housing that houses in its interior the electrical components. . . ."  *Id.* at 26 (5:1-4).  The Court understands the principle difference between Defendants' proposal and LEGO's proposal is that Defendants believe the exoskeleton (1) must have a patterned surface and (2) it cannot include a casing or a case.

While claim 1 of the '191 Patent does reference "interior region" and "patterned surface portion," a finding that such terms are *required* in the claim is unnecessary.  A court is to use the specification "as the single best guide to the meaning of a disputed term," *Phillips*, 415 F.3d at 1315, but it should not do so in a way that creates inconsistency within the uses of a claim term, *see id.* at 1314 (stating that "claim terms are normally used consistently throughout the patent").  The Court will not rely solely upon the Figure 4 preferred embodiment to create a claim construction for "exoskeleton" at the exclusion of other embodiments.  *See Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 857 (Fed. Cir. 2014) (noting "a construction that excludes a preferred embodiment is rarely, if ever, correct and

would require highly persuasive evidentiary support") (internal quotation marks omitted).  Contrary to Defendants' position, "interior portion" need not be present in the claim construction simply because it appears in one preferred embodiment description.  *See Janssen*, 2003 WL 25819555, at *9; *see also 3M Innovative Props. Co.*, 725 F.3d at 1321.

Indeed, the claim phrase "an exoskeleton having an interior region and a patterned surface portion" appears only in claim 1.  It is not clear to the Court whether Defendants seek to insert this claim phrase into every instance where "exoskeleton" is used.  Were it to do so, the term would become overly confusing.  The Court is satisfied with the simplicity and broad application of LEGO's proposed claim construction and therefore adopts it in full.

### 3. *"Interior Region" and "Control Actuators"*

The parties dispute whether "interior region" and "control actuators" should be construed separately or together.

LEGO seeks to construe "interior region" as a compound term of two words, "interior" and "region," which can be defined through their ordinary and customary meanings.  Accordingly, the claim term "interior region" should mean, "the region bounded by the inwardly facing surfaces of the housing portion of the exoskeleton."  *See* [Dkt. 34-1, at 4-5].  LEGO defines "control actuators" as "any mechanism on the manual controller that may be touched by a user to produce signals for manipulating images or symbols on the display."  *Id.* at 5.

Defendants argue that "interior region" and "control actuators" should not be construed as separate terms, but rather should be considered as they appear in three different claim phrases:

- **'191 Patent Claim 1**: "the internal electrical components operatively connected to *control actuators* to produce signals for manipulating images or symbols on the display," [Dkt. 71-1, at 26 (6:51-54) (emphasis added)];

- **'892 Patent Claim 1 and '085 Patent Claim 1**: "an *interior region* confining electrical components operatively connected to *control actuators* to produce signals for manipulating image or symbols on the display," [Dkt. 71-2, at 25 (6:52-54) (emphasis added); Dkt. 71-3, at 25 (6:52-54) (emphasis added)];

- **'066 Patent Claim 1**: "an *interior region* confining electrical components for producing signals for manipulating image or symbols on the display" [Dkt. 71-4, at 25 (6:55-57) (emphasis added)].

According to Defendants, these three claim phrases should receive the same construction: "the internal electrical components within the housing of the controller are connected to control actuators (i.e., mechanical hand operated buttons or analog control sticks) to allow a user to control the gaming images and symbols on the display." [Dkt. 34-1, at 10]. Defendants also define "actuator" as a "mechanical device for moving or controlling something," although they did not include "actuator" as a claim term proposal. [Dkt. 35, at 15 (citing Def.'s *Markman* Ex. 5 (dictionary unknown))].

Defendants' proposal to give three *separate* claim phrases *one* claim construction is not consistent with the purpose of claim construction, which is to define a claim term or phrase that can be consistently applied throughout a patent or series of patents. *See generally NTP, Inc.*, 418 F.3d at 1293 (finding that where patents "derive from the same parent application and share many common terms,

[the Court] must interpret the claims consistently across all asserted patents");
*SightSound Techs., LLC*, 809 F.3d at 1316 (same). Notably, "the patentee is required to define precisely what his invention is," and "it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *Phillips*, 415 F.3d at 1312. There is a reason the above different claim phrases exist, and the Court will not ignore the patentee's precise phrasing in each distinct patent by combining them into a singular definition.

The Court finds it is more appropriate to construe "control actuators" and "interior region" as separate claim terms. Much of the *Markman* hearing was devoted to defining "control actuators" and whether they are simply mechanical or may also be electrical in this context. Furthermore, the terms "control actuators" and "interior region" are often separately referenced throughout the specification. *See, e.g.,* [Dkt. 71-1, at 26 (3:17-21) ("Skilled persons will appreciate that the above-described number of <u>control actuators</u>, control actuator layout pattern, and hand grip arrangement represent only one of numerous possible control actuator and hand grip configurations.") (emphasis added)]. The terms are herein separately discussed.

### i. Control Actuator

The claims referencing "control actuator" or "actuator" are claim 1 of the '191 Patent; claims 1, 4-6 of the '892 Patent; claim 1-4 of the '085 Patent; and claims 2-4 of the '066 Patent. At issue is whether a "control actuator" *requires* the function to be mechanical or whether it may function electronically as well. LEGO's proposed "control actuator" term—"any mechanism on the manual controller that may be

touched by a user to produce symbols for manipulating images or symbols on the display"—leaves open the possibility that an actuator is electrical. [*See* Dkt. 34-1, at 6-7]. This is important because a construction of "control actuator" as one that operates through an electrical mechanism includes cellular phones with touch screens. [Dkt. 64 (*Markman* Hearing), at 11:07].

Defendants argue that "an actuator by definition is mechanical" and "doesn't include a touchscreen." *Id.* Limiting the term to that which is mechanical alone will preclude patent infringement for products made for an iPhone, iTouch, or iPad. As Defendants correctly point out, the preferred embodiments refer only to analog stick controls, mechanical buttons, and control pads as "actuators." *See* [Dkt. 35, at 15-16 (citing Dkt. 71-1 (e.g. Figures 1, 3, 4, 6A, 7A))]. These examples are mechanical because they are physically operated. [Dkt. 64, at 11:11].

Despite what is depicted in the preferred embodiments, the summary of disclosure describes "control actuators" as being "positioned for tactile manipulation by a user to cause production of the signals." [Dkt. 71-1, at 24 (1:57-58)]. Tactile manipulation could include touching the screen of a cellular telephone, portable video games system, or portable hand-held device, all identified in the background information as examples of a manual controller. The preferred embodiments cannot be used to limit the terms of the patent if, as here, doing so would be contrary to that which a "person of ordinary skill in the art in question at the time of the invention" would read the term when considering the claim as a whole. *See Phillips*, 415 F.3d at 1313.

The Court reviewed several dictionary definitions to better understand the scope of what an "actuator" might be. *See Starhome GmbH*, 743 F.3d at 856 ("[J]udges are free to rely on dictionaries at any time during the process of construing claims so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.") (internal quotation marks omitted). The Dictionary of Information Technology defines "actuator" as a "mechanical device that can be controlled by an external signal (such as the read/write head in a disk drive)." *Actuator*, Dictionary of Information Technology (3d ed. 2002). However, the Dictionary of Mechanical Engineering defines an "actuator" more broadly as "an *electric, hydraulic, mechanical or pneumatic* device, or combinations of these, to effect some predetermined linear or rotating movement."[6] *Actuator*, Dictionary of Mechanical Engineering (1999). The variation amongst "actuator" definitions, some which are limited to mechanical and some which are not, support a conclusion for a broader construction.

To the extent Defendants argue the patents do not contemplate non-mechanical control actuators, claim 7 of the '066 Patent provides for "[t]he method of claim 1, in which the controller comprises a cellular telephone and a control section, the cellular telephone being operationally responsive to user-entered commands that are delivered to the control section." [Dkt. 71-4 at 27 (8:13-16)]. A court may use

---

[6] Defendants' counsel is a mechanical engineer by training and argued that in his field an actuator is by definition mechanical. [Dkt. 64, at 11:10]. Not only does this position fail to consider other fields of engineering, but the Dictionary of Mechanical Engineering includes other types of actuators: electric, hydraulic, and pneumatic.

other claims to help determine the meaning of a claim term, and here the Court finds this claim instructive. *See Phillips*, 415 F.3d at 1314. As the specification makes clear, a user can manipulate a control actuator "to cause production of the signals," [Dkt. 71-1, at 24 (1:57-58)], and control actuators are the very means by which a user would enter a command that would then be delivered to the control section as expressed in claim 7. The specification does not set forth any other manner in which a command could be entered and delivered to a control section, and the Court must construe a claim so as to apply consistently throughout the patent and other patents within its family. *See Phillips*, 415 F.3d at 1314; *Trustees of Columbia Univ.*, 811 F.3d at 1369. Given that "continuing applications may present broader claims than were allowed in the parent," Defendants did not present any evidence from the prosecution history that the applicant "surrendered or disclaimed" claim scope, and the patents relate back to the original patent, the Court finds the language in claim 7 of the '066 Patent supports the broad construction of the term "control actuator." *See Hakim*, 479 F.3d at 1313; *Lemelson Med., Educ. & Research Found.*, 422 F.3d at 1385.

Therefore, the Court adopts LEGO's proposal in its totality and construes "control actuator" to mean "any mechanism on the manual controller that may be touched by a user to produce signals for manipulating images or symbols on the display." [Dkt. 34-1, at 5].

ii.     Interior Region

"Interior region" is referenced in claim 1 for each of the four patents. The summary of disclosure, which applies to all four patents, provides that "[t]he

interior region is configured to confine internal electrical components that are operatively connected to and cooperate with control actuators to produce signals for manipulating images or symbols on the display." [Dkt. 71-1, at 26 (1:54-57)]. In some circumstances, a specification "may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips* 415 F.3d at 1316; *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("[A]n inventor may choose to be his own lexicographer if he defines the specific terms used to describe the invention with reasonable clarity, deliberateness, and precision.") (internal quotation marks omitted). However, typically "[i]n the absence of an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning." *Teleflex*, 299 F.3d at 1325. The term "interior region" is not a special definition. The claim does not contain a clear definition reasonably calculated to convey an intent to create a unique definition. Instead, the term is used to describe the location of functional components of the invention, not its function. There is nothing about this phrase that suggests the inventor intended to convey a special meaning for the term "interior region."

Accordingly, the Court finds that "interior region," which is used throughout the specification (i.e. beyond the four claims), is an example where "the ordinary meaning of claim language as understood by a person of skill in the art [is] readily apparent even to lay judges" leading the claim construction to be "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. Webster's Third New International Dictionary Unabridged defines

"interior" in several ways, including "being within the limiting surface or boundary" and "the internal or interior part of a thing." *Interior*, Webster's Third New Int'l Dictionary of the English Language Unabridged (3d ed. 2002). Its most applicable definitions of "region" is "a major indefinite division of inanimate creation" or "a particular part of the world or universe (as natural waters, the sky, a particular galaxy)." *Region*, Webster's Third New Int'l Dictionary of the English Language Unabridged (3d ed. 2002). In keeping with the principle that claim terms are to take on their ordinary meaning and be consistently used throughout the patent, the Court hereby adopts LEGO's proposal for "interior region": "the region bounded by the inwardly facing surfaces of the housing portion of the exoskeleton." [Dkt. 34-1, at 4].

### 4. *"Recreation Equipment Item"*

The term, "recreation equipment item," appears in claim 1 of the '085 Patent. The parties dispute whether the term is limited to a piece of sports equipment as featured in the preferred embodiments.

LEGO proposes the "recreation equipment item" claim term to mean "an item or device that may be used in a recreation activity." [*See* Dkt. 34-1, at 7, 12]. LEGO derives this claim term from the ordinary meaning of "recreation activity," and argues that Defendants' claim term construction of "recreation equipment item" impermissibly fails to cover one of the preferred embodiments (Figure 1, manual controller). *See* Dkt. 36, at 26-27 (citing *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007)).

Defendants posit that "recreation equipment item" must be considered within the claim phrase of '085 Patent claim 1—"including multiple components of which adjacent ones mate with each other to form a replica of at least a portion of a <u>recreation equipment</u>" (emphasis added)—and the phrase must be construed as the following: "attaching building elements to a controller so that adjacent building elements mate to one another to form an exact copy or a very close copy of at least a portion of a piece of sports equipment (*i.e.* a bat or a golf club) for use with a video game." [Dkt. 34-1, at 12-13]. Defendants argue the language in the specifications and the drawings themselves (Figures 6A through 9C) reference baseball bats and golf clubs, and that the claim term must include such references so that it is clear the controller is a replica of a baseball bat or golf club rather than the real item. [Dkt. 35, at 19-20]. Defendants also point out that LEGO's claim term proposal does not provide any meaningful clarification, as the term uses "recreational activity."

"Recreation" is commonly defined as "the act of recreating or the state of being recreated: refreshment of the strength and spirits after toil: DIVERSION, PLAY;" or "a means of getting diversion or entertainment;" or "equipped so as to provide diversions or amusements." *Recreation*, Webster's Third New Int'l Dictionary of the English Language Unabridged (3d ed. 2002). "Equipment" as applied here is "the implements (as machinery or tools) used in an operation or activity." *Equipment*, Webster's Third New Int'l Dictionary of the English Language Unabridged (3d ed. 2002). An "item" is best defined as an "individual object." *Item*, Webster's Third New Int'l Dictionary of the English Language Unabridged (3d

ed. 2002). While an "equipment" can vary widely in size and complexity, the pairing of "equipment" with "item" in this claim term narrows the type of "equipment" so as to be contemplated by the specification.

The '085 Patent uses the term "recreation equipment item" three times. [Dkt. 71-3, at 24 (2:15-18), 26 (6:56-67)]. The term first appears in the summary of disclosure section where the patent reads:

> In a second embodiment, the exoskeleton of a controller comprises a unitary main and hand grip section that includes at least one patterned surface portion on which a user can build with the building elements 15 to create a customized controller. The resulting arbitrary controller configuration determined by a user *can be* a recreation equipment item, for example as described below, a golf club or a baseball bat.

*Id.* at 24 (2:11-18) (emphasis added). This italicized language clearly expresses the inventor's intention not to limit the invention. In describing claim 1 of the '085 Patent, the language states the invention replicates a recreation equipment item; claims 2 and 4 incorporate claim 1. *See id.* at 26 (6:49-7:11). In addition, the preferred embodiments depicted in the figures of the '085 Patent include a non-sporting device. *See id.* at 4-23. Indeed, the first preferred embodiment is a non-sporting item. The background information section of the '085 Patent lists cellular telephones, portable video game systems and portable multi-media devices as examples of the types of manual controllers included in the invention. *Id.* at 24 (1:38-43). The '085 Patent is broad enough to describe any number of non-sporting items not included in the expressly non-exhaustive list of devices highlighted above. Indeed, other conceivable devices include a paint brush, sword, or conductor's wand, all of which are conducive to building upon them. Read as a

whole, the '085 Patent is not limited to sporting items. Defendants' proposal to limit the term to sporting equipment is unsupported by the common meaning of the term recreation or the language of the patent itself. The term "recreation equipment item" in this context clearly means any type of electronic equipment used to engage in a leisure activity to refresh either one's body or mind. The Court holds that the term "recreation equipment item" shall thus be construed as "an object used for a diversionary, leisure, or sporting activity." "Replica" requires no construction as it may be construed according to its ordinary meaning.

### 5. *"Play Item"*[7]

"Play item" appears in claim 1 of the '066 Patent. Rather than addressing "play item," Defendants seeks to construe the entire claim phrase "providing in the set of building elements a subset of building elements that are matable to one another and configured for a user to build on the patterned portion of the main casing a customized replica of at least a portion of the play item." The parties principally dispute whether this phrase is indefinite because of the term "play item."

Defendants propose a claim construction of the claim phrase:

> Providing building elements, that include a set and a subset of building elements, so that in the subset of building elements, the building elements mate to one another to form on the patterned surface of the casing an exact or a very close copy of at least a portion of a piece of sports equipment used in recreational sports (*i.e.,* a bat or a golf club).

---

[7] The parties listed "play activity" in the Joint Disputed Claim Terms Chart as one of Defendants' claim term proposals. Other than claiming "play activity" was indefinite in the chart, the parties did not brief "play activity" and did not discuss it at the *Markman* hearing. The Court thus subsumes this proposal into the "play item" analysis as they both address the indefiniteness of the term, "play."

[Dkt. 35, at 21]. Despite this lengthy proposal, Defendants' briefing is devoted only to the term "play item." *Id.* First, Defendants argue that "play item" is indefinite as it does not appear in the specification and merely replaces "recreation equipment item" from the previous '085 Patent. *Id.* at 22. Second, Defendants request that the Court refrain from defining "play item" so they may later argue indefiniteness or in the alternative define "play item" the same as "recreation equipment item." *Id.*

LEGO proposes that the words "play" and "item" should be given their plain, ordinary meaning as it would be clear to someone skilled in the art. [Dkt. 36, at 41]. In fact, according to LEGO all terms in the lengthy claim phrase should be given their ordinary meaning with the exception of "building elements" and "casing." *Id.* at 41-42. LEGO argues the terms "play" and "item" are in general use and are therefore understood by the person of ordinary skill in the art. [Dkt. 36, at 41].

It is the Court's duty to resolve "a dispute over the scope of the asserted claims [as it] is a question of law." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). The parties' dispute as to whether "play" is limited strictly to sports activities reflects the same dispute over the scope of the asserted claim discussed above relative to the term "recreation activity item." "A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* Here, "play" could be used to mean "the conduct or carrying on of a game;" but it could also mean "the spontaneous or organized recreational

activity of children." *Play*, Webster's Third New Int'l Dictionary of the English Language Unabridged (3d ed. 2002). The terms "play" and "recreation activity" have the same meaning here; in fact, "recreation" is used to define "play" and vice versa. *See id; see also Recreation*, Webster's Third New Int'l Dictionary of the English Language Unabridged (3d ed. 2002). The term "play" modifies the broad term "item" to mean an item used to play. Together they create a term synonymous with "recreation equipment item." In addition, there is no intrinsic evidence suggesting that the inventor undertook the role of lexicographer in using the term "play item," *see Teleflex, Inc.* 299 F.3d at 1325, and the preferred embodiments depict both simulated sports equipment and non-sporting equipment. All these items depicted as preferred embodiments are items used for leisure or recreational activities. Therefore, "play item" shall have the same claim construction as "recreation equipment item," which comports with the ordinary meaning.

6. *"Display"*

The term "display" appears in claim 1 for each of the four patents. Defendants advocate for "display" to be construed as "a display remote from the controller." [Dkt. 34-1, at 11]. LEGO instead requests that "display" take on its ordinary, plain meaning. [Dkt. 36, at 33]. The central dispute is whether an ordinary person skilled in the art would have contemplated at the time of the invention a device where the display and controller could be integrated, which implicates, for example, a smart phone that that operates both as the controller and the display.

The intrinsic evidence makes clear that the invention includes devices in which the display and the computing functions are incorporated or integrated in a single device. "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp.*, 90 F.3d at 1582; *see Lamoureux*, 669 F. Supp. 2d at 255 (stating a court must consider the specification in construing a claim). The background information of all the patents at issue specifies the patent pertains to "a manual controller for manipulating images or symbols on a visual display of a computer device." [Dkt. 71-1, at 24 (1:29-34)]. While that language could be construed to mean the computing device is separate, the list of "manual controllers" includes cellular telephones, portable video game systems and portable multi-media devices. All three of these devices can be integrated devices having the visual display and the computing function contained within a single device. The figures depict devices which are not integrated, but the preferred embodiments cannot be used to limit an otherwise unlimited claim. *3M Innovative Props. Co.*, 725 F.3d at 1321. References to a preferred embodiment in a specification is not a claim limitation. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d at 1121. Accordingly, the Court holds that a person skilled in the art at the time of the invention would have understood that the display could either be integrated in or separate from the controller. Therefore, the Court adopts Lego's proposed construction.

### 7. *"Finished" Terms*

Claims 1 and 2 in the '892 Patent refer to the term "finished," the former referring to a "finished surface" and the latter referring to a "finished decorative pattern."

[Dkt. 71-2, at 26-27 (6:49-7:3)].[8]   Defendants contend that "finished" means "smooth" and "uniform," resulting in a claim construction wherein "the *entire* surface" contains "a *smooth uniform* finish." *Id.* at 12 (emphasis added).[9]   LEGO instead advocates for a plain meaning construction and directs the Court to the preferred embodiments wherein the entire surface is neither smooth nor uniform. [*See* Dkt. 71-1, at 6 (Fig. 3)].

The Court agrees with LEGO that Defendants' interpretation is inappropriate here.  *See 3M Innovative Props. Co.*, 725 F.3d at 1321.  The specification uses the term "finished" variously.  In some instances the term is incorporated into the term "unfinished."  For example, the specification states that

> FIGS. 8A, 8B, 8C, and 8D are, respectively, plan, side elevation, isometric, and partly exploded views of a third example of a customized controller built with several layers of mated building elements around the type of remote controller shown in FIG. 4 to form a baseball bat with an unfinished surface.

---

[8] Defendants initially contended that the claim phrase from claim 1—"the set of building elements including a subset of building elements having top surfaces that do not having mating features so as to enable a user to assemble the building elements in the subset to product a *finished surface* of the main casing"—should be construed as a whole as opposed to broken down into separate claim phrases of "set of building elements," "subset of building elements" and "finished surface." [Dkt. 35, at 24-25].  However, the parties subsequently stipulated to the plain meaning construction of the first and second terms.  Therefore, what is left before the Court is a construction of "finished surface."

[9] Specifically, the Court interprets what is left of Defendants' claim 1 argument to mean "finished surface of the main casing" should be "an entire surface of the main casing a smooth uniform surface."  [Dkt. 34-1, at 12].  Defendants contends claim 2's language, "finished decorative pattern," should be construed as "the entire surface has a smooth uniform finish that is a decorative pattern."  *Id.*

[Dkt. 71-2, at 24 (2:46-51)].  In those figures, the device contains nodules on which LEGO blocks may be affixed.  In another instance, the specification states: "[b]uilding elements 122 intended to provide a finished surface *typically* do not have top surface mating features that would enable stacking of another layer of building elements."  *Id.* at 25 (4:11-14) (emphasis added).  Further, the specification also explains that "FIG. 3 shows attached to main housing 14 (FIG. 1) a building element 122*s* having a smooth top surface that can be of a color or that contributes to a finished decorative pattern selected by a user." *Id.* at (4:33-36).  In describing Figure 9, the specification states, "Baseball bat 260 presents with very few building elements a finished replica of a baseball bat." *Id.* at 26 (6:39-40).  Finally, claim 1 of the '892 patent describes the main casing having

> a patterned surface portion configured to support a set of building elements that are configurable for mating to the patterned surface portion, the set of building elements including a subset of building elements having top surfaces that do not have mating features so as to enable a user to assemble the building elements in the subset to produce a finished surface of the main casing.

*Id.* at 26 (6:59-67).  Although the specification states that in most instances the finished surface will be smooth, it describes "finished" variously as both having and not having a smooth surface.  The recognition that a "finished surface *typically* do[es] not have top surface mating features that would enable stacking of another layer of building elements," [Dkt. 71-2, at 25 (4:11-14), means that a finished surface could have such features.  The Court also notes that the specification specifically uses "smooth" and "finished" at different instances.   Were the specification ambiguous and the Court resorted to the dictionary for guidance, LEGO's proposed definition would be further supported because the term "finished" can

35

be defined as "brought to conclusion" or "ready for packing, shipment, or sale —
used of materials or goods": or "possessed of, brought to, or displaying the
highest degree of skill, polish, or excellence." *Finished*, Webster's Third New Int'l
Dictionary of the English Language Unabridged (3d ed. 2002). The Court thus
construes the claim term "finished" as "complete (for its intended purpose of being
adaptable to user preferences)." Corresponding terms, "decorative pattern" and
"surface," shall be defined according to their ordinary and customary meaning.

   8. *"Providing"*

   The parties dispute whether the term "providing," which applies to the '066
Patent claim 1[10] and claim 6,[11] should receive a claim construction. LEGO argues
that "providing" should be construed under its ordinary, common usage, as "to
make a preparation to meet a need." [Dkt. 36, at 42]. This proposed definition can

---

   [10] Claim 1 of the '066 Patent states the following: "A method of facilitating user
preference in creative design of a controller for manipulating images or symbols
on a display, the controller having a housing with an exterior surface and an interior
region confining electrical components for producing signals for manipulating
image or symbols on the display, comprising:
   <u>providing</u> a main casing configured to conformally fit around a portion of the
exterior surface of and thereby receive the housing of the controller, the main
casing having a patterned surface portion configured to support a set of building
elements that are configurable for mating to the patterned surface portion; and
   <u>providing</u> in the set of building elements a subset of building elements that are
matable to one another and configured for a user to build on the patterned surface
portion of the main casing a customized replica of at least a portion of a play item
and thereby transform the exterior surface of the housing of the controller to a
customized shape and appearance in accordance with the user's preference. [Dkt.
71-4 at 26-27 (6:52-7:4)].

   [11] Claim 6 states, "The method of claim 1, in which the set of building elements
constitutes a first set of building elements, and further comprising <u>providing</u> a
second set of building elements in the form of multiple components having matable
and nonmatable surfaces. . . ." *Id.* at 27 (8:1-12).

be found in the Merriam-Webster Dictionary.  *See Provide*, Merriam-Webster Dictionary (2017), available at https://www.merriam-webster.com/dictionary/provide.   Defendants propose that "providing" be construed as "to supply the item to the user" as it is consistent with the claim language.  [Dkt. 35, at 26].  The Court finds the term "providing" is somewhat awkwardly used, particularly as it is preceded by the common transitional patent term "comprising."  The context of the claim, however, is informative.  The term "providing" precedes two sections of the claim, each describing a component.  Accordingly, the Court construes the term "providing" as "to supply what is needed for sustenance or support," *Providing*, Webster's Third New Int'l Dictionary of the English Language Unabridged (3d ed. 2002), which is synonymous in its function with "having."

## B.  *Stipulated Terms*

The parties have stipulated to four claim terms:

- "Building elements" – "Any components or objects that are configured for mating to a patterned surface portion of the exoskeleton and to one another."  [Dkt. 49 (Response to Order), at 2].

- "Tactile Manipulation" – "When the user's fingers touch and manually manipulate the control actuators."  *Id.*

- "Housing" – "The exterior shell of the controller that covers the internal electronics of the controller."  *Id.*

- "Casing" – "A structure that is separable from and covers one or more surfaces of the housing of the manual controller."  *Id.*

The parties also stipulated at the *Markman* hearing that the previously disputed claim terms, "set of building elements" and "subset of building elements," may be

interpreted according to their plain and ordinary meaning. [Dkt. 64 (*Markman* Hearing), at 11:40 (referencing presentation slides submitted to the Court)].

V. <u>Conclusion</u>

The Court has considered the parties' arguments. It is hereby ORDERED that the claim terms will be construed as follows:

- "<u>Controller</u>" and "<u>Manual controller</u>" mean "a handheld device used to manipulate images or symbols on a visual display of a computing device, which may or may not be integrated with a computing device."

- "<u>Configurable</u>" shall be defined according to its ordinary, plain, and customary meaning.

- "<u>Exoskeleton</u>" means "the entire external portions of or surrounding a manual controller."

- "<u>Control actuator</u>" means "any mechanism on the manual controller that may be touched by a user to produce signals for manipulating images or symbols on the display."

- "<u>Interior region</u>" means "the region bounded by the inwardly facing surfaces of the housing portion of the exoskeleton."

- "<u>Recreation equipment item</u>" and "<u>play item</u>" shall be synonymously defined "an object used for a diversionary, leisure, or sporting activity."

- "<u>Replica</u>" shall be defined according to its ordinary, plain, and customary meaning.

- "<u>Display</u>" shall be defined according to its ordinary, plain, and customary meaning.

- "<u>Finished</u>" means "complete (for its intended purpose of being adaptable to user preferences)." Corresponding terms, "<u>decorative pattern</u>" and "<u>surface</u>," shall be defined according to their ordinary, plain, and customary meaning.

- "<u>Providing</u>" means "to supply what is needed for sustenance or support."

The parties are ORDERED to meet and confer and propose an amended schedule for the remaining deadlines in this case in light of the present progress of this case and the vacated scheduling order. *See* [Dkt. 22 (Vacated Scheduling Order)]. The parties shall file this proposal on or before October 18, 2017. The Court also refers this case to Magistrate Judge Richardson for a settlement conference.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 27, 2017